---

## THE AVON.

*(District Court, N. D. Illinois.   January 5, 1885.)*

1. COLLISION—VESSEL AT ANCHOR—LIGHTS—ADMIRALTY RULE 2.

   The purpose of admiralty rule 2 was to have at least one bright white light set on a vessel at anchor so high as to be clearly visible from all directions, and which from its comparative height and the fact that it was stationary would indicate at once that it was upon a vessel at anchor; but having another light, even in the rigging or upon the hull or in the cabin windows, would not contradict such indication, or mislead an approaching vessel, and violate this rule.

2. SAME—EXHIBITION OF TORCH.

   It is not necessary for a vessel at anchor to show a torch when its lights are properly set and burning, and an approaching vessel, by a vigilant and proper lookout, can see her without a torch.

3. SAME—LOOKOUT—COMPETENCY—USE OF NIGHT-GLASS.

   A man who needs a night-glass to enable him to discover lights in time to avoid a collision is unfit for a lookout. His own natural vision should be sufficient to perform all the duties of a lookout.

4. SAME—STEAM-PROPELLER AND ANCHORED BARGE—NIGHT—LIGHTS—TORCH—LOOKOUT—FAULT—DAMAGES.

   Upon examination of the evidence, *held*, that it is not shown, as claimed by the respondent, that the collision between the steam-propeller Avon in the night-time, on Lake Michigan, off the harbor of Milwaukee, with the barge Thomas A. Scott, while lying at anchor, was caused by the barge being anchored in an unsafe and improper place, or by a violation of admiralty rule 2 by her in displaying two lights, or by her failure to exhibit a torch when those

in charge of her saw the Avc⁻ approaching; but that the collision was caused by the negligence of the captain and lookout of the Avon, and that the Avon should bear the loss occasioned thereby.

In Admiralty.

*Robert Rae,* for libelant.

*C. C. Clarke* and *Williams & Potter,* for respondent.

BLODGETT, J. About 8 o'clock in the evening of October 29, 1880, a collision occurred on the navigable waters of Lake Michigan, off Milwaukee harbor, between the steam-propellor Avon and the four-masted schooner-barge Thomas A. Scott, while the barge was lying at anchor, whereby the barge was sunk and became a total loss. The Phenix Insurance Company and the Faneuil Hall Insurance Company had each issued season policies of insurance on the hull of the barge for the sum of $2,000, which were in force at the time of the collision; and the Phenix Insurance Company, having reinsured the risk of the Faneuil Hall Company, paid the loss on both policies, amounting to $4,000, and now brings this suit against the Avon to recover the amount so paid, alleging that the collision and the loss of the barge occurred solely by reason of the negligence and want of due care of those in charge of the Avon. The defenses set up are: (1) That the barge was anchored in an unsafe and improper place; (2) that the barge displayed two anchor lights, when, under the law, she should have shown but one; (3) that those in charge of the barge were guilty of contributory negligence in not showing a torch when they saw the Avon approaching the barge.

The proof shows, without dispute, that the barge in tow of the propeller Conemaugh was on a voyage from the port of Chicago to the port of Buffalo; that the Conemaugh, having occasion to enter the harbor of Milwaukee, dropped the barge a short distance outside the entrance to the harbor, and the barge came to anchor about half a mile nearly due east of the outer ends of the piers. The wind being southerly, she swung with her bow to the south, and her length over all being about 250 feet, she may be said to have lain directly opposite or athwart the entrance to the harbor, although a half-mile out in the bay beyond the entrance. There was ample depth of water to the north and south of the barge to enable vessels leaving or entering the harbor to pass the barge either to the north or south, and the usual course of steam-vessels bound to Chicago would carry them to the south, and those bound to the lower lakes would go to the north, of the place where the barge lay. The Avon, on a voyage from Buffalo to Chicago, entered the port of Milwaukee in the afternoon of the day of the collision, to discharge some freight, and left to pursue her voyage to Chicago about 8 o'clock in the evening. She was assisted to wind in the harbor by the tug Merrill, and then proceeded down the harbor with her own power. The night was not very dark, but there was some smoke on the waters of the bay about the mouth of the harbor, which came from the rolling-mills on the south side of the bay,

about a mile and a half south or south-east of the ends of the piers.

The barge had her anchor watch on duty, the mate being officer of the deck, and a proper anchor light hung on the jib-halyards from 12 to 20 feet above the deck, and where it was in plain sight of those approaching her. The proof also shows that there was another light seen upon the after-part of the barge; some of those who saw it concluding that it was a cabin light, and others thinking it was a lantern hung in the aft rigging. The officers and crew of the barge all concur in the statement that no light was intentionally set or displayed as a signal light in the after-part of the barge, and my own conclusion is that the light seen by the tug-men and crew of the life-saving station on the after-part of the vessel was a cabin light. But just a few moments before the Avon struck the barge, and when the collision was imminent, the mate of the barge took from the deck-house a bright lantern, ran along the deck with it, swinging it to attract attention; and this light may have been set down on the top of the cabin, or hung up in some of the after rigging, and thus have been the after light to which the mates of the Avon say the captain called their attention after the collision, and before the barge went down. The Avon had her side lights and her mast-head light duly placed, and all were brightly burning when she came down the harbor, and up to the time of the collision, and the proof is conclusive that her lights were plainly seen from the deck of the barge before she left the ends of the piers, until the collision. Why I say this fact is conclusively shown, is because it is unequivocally testified to by the crew of the barge, and several disinterested witnesses who were on board of tugs out in the bay, in the vicinity of the barge. The Avon had discharged some or all of her freight, so that she was down by the stern from the weight of her engines, and perhaps some freight aft, so that her bow was well out of water, and her lookout was stationed on her upper deck, forward of the wheel-house, and the captain, who was officer of the deck, stood near, and in front of the wheel-house.

As to the point made, that the barge was anchored in an unsafe place, I do not think the position is sustained by the proof. There was ample room for vessels leaving or entering the harbor to avoid her; and, in fact, the Avon, in laying her course for Chicago, after passing the end of the piers, would naturally have gone to the south of the space occupied by the barge. The half-mile intervening after the Avon was clear of the piers gave all the room that was needed to change her course, and go either to the south or north of the barge. For steam-vessels, whose course was not controlled by the wind, the course for the lower lakes and to ports north and north-east of Milwaukee was to the north, and for those bound to Chicago the course was to the south of where the barge lay; and only as to those bound directly across the lake—say to Grand Haven or perhaps Muskegon—could the barge be said to lie directly in their path. So, too, a

steamer leaving the harbor would not have obtained such headway at so short a distance from the ends of the piers as to make it difficult to stop or slow as at a greater distance out, when she had got under a full head of steam. And sail-vessels, which are now invariably towed by steam-tugs into and out of the large harbors of these lakes, like Milwaukee and Chicago, would much more readily avoid a collision with a vessel at anchor within a half-mile of the entrance to the harbor than at a larger distance out, because the tugs, in taking them out, would tow them beyond the point where the barge lay to give them a good offing, and would take hold of those to be towed in at a point outside, because a vessel, as a matter of prudence, would hardly sail so close to the jaws of the pier without putting herself in charge of her tug. As vessels leaving Milwaukee harbor go to the south-east, north-east, or east, as their course to their ports of destination require, any vessel coming to anchor off the mouth of the harbor may be said to be in the pathway of some one. So, also, Milwaukee is one of the most important intermediate ports between Chicago and Milwaukee, the *termini* of the great lake route; and the bay into which the harbor opens affords a safe and convenient anchoring ground for all vessels which have occasion to wait outside the harbor, and hence very many of the vessels engaged in commerce on the lakes have occasion to call at this port on their voyages between the upper and lower lake ports, and a vessel, therefore, can scarcely come to anchor in the bay outside the harbor of Milwaukee without being in the pathway of others arriving and departing, and this fact puts all vessels leaving or entering the harbor upon notice that a vigilant lookout must be kept for vessels at anchor off the mouth of the harbor. Upon the proof, then, I do not find that the Scott was at anchor in an improper or unsafe place, as to other vessels leaving the harbor of Milwaukee.

As to the second point, that the barge displayed tow anchor lights, I have already said it is my conclusion, from the proof, that the barge had only one light set, which was intended as an anchor light, and that this light was hung in her jib-halyards, where it could be and was plainly seen, and that, although two lights may have been seen on her, one was probably a light in her cabin, and the lantern swung by the mate, and afterwards hung over or placed on top of the cabin, may have been the other light mentioned by the witnesses on the Avon, from which they concluded that she had two anchor lights set. But even if she had two bright white lights hung in her rigging, one forward and the other aft, I do not see from the proof how that contributed to bring about the collision. In the first place, it did not confuse or deceive any one else. The tug-men passing in or out of the harbor, and the men at the life station, were not misled by it; while, from the testimony of all the witnesses on the Avon, it is clear that they did not make out either light in time to have avoided the collision. There is no proof showing that the conduct or management

of the Avon was in any degree embarrassed by the fact that they saw two lights, instead of one, on the barge. When they discovered one or both the lights on the barge, and came to the conclusion that such light or lights were on a vessel at anchor, it was too late, by their own showing, to avoid the collision.

It is contended by respondents that a display of two lights by a vessel at anchor is in direct violation of the law, and therefore libelants cannot recover, because rule 2 says: "The lights mentioned in the following rules, *and no others*, shall be carried in all weathers between sunset and sunrise." And rule 10 says: "All vessels, whether steam-vessels or sail-vessels, when at anchor in roadsteads or fairways, shall, between sunset and sunrise, exhibit *where it can best be seen*, but at a height not exceeding 20 feet above the hull, a white light in a globular lantern of eight inches in diameter, and so constructed as to show a clear, uniform, and unbroken light, visible all around the horizon, and at a distance of at least one mile."

Under the facts in this case, as I find them from the proof, it is not necessary that the court shall decide whether a vessel lying at anchor may not and should not, under circumstances which can readily be imagined, display more than one anchor light, because the proof satisfies me, being that of her crew, who are presumed to have the best information as to what was done on board of her, that this barge set only one anchor light, and that at the proper height above the deck, and in a properly conspicuous place, and of the size and construction required by the rules; but, certainly, the rule does not require that a vessel at anchor shall extinguish or inboard her cabin lights so that no light can possibly be seen from any part of her hull. It seems to me the purpose of the rule was to have at least one bright white light set, so high as to be clearly visible from all directions, and which, from its comparative height, and the fact that it was stationary, would indicate at once that it was upon a vessel at anchor; but other lights, even in the rigging, or upon the hull, or in the cabin windows, would not contradict such indication or mislead an approaching vessel.

The hull of this barge was a trifle over 200 feet long, and if two lights had been displayed, one at each end, I cannot see how it could have misled any one on a vessel approaching her, because rays of light are not bent or deflected laterally in passing through the air so as to change the apparent locality of the source from whence they come. The lookout on the Avon states he saw the lights, and that they seemed to be at least a quarter of a mile apart; and hence it is argued that those in charge of the Avon were misled because they thought they were upon two different vessels, and steered between them. There is proof in the case showing there was a tug just a little to the north and outside of the Scott, which was showing her lights, and it is possible that the lookout of the Avon may have seen the tug light as well as the anchor light on the Scott; and, probably, they

would have been a quarter of a mile apart. But the idea that if there were two lights on the Scott, they would appear, under any circumstances, to have been further apart than they actually were, is absurd, from any point of view it is considered. Rays of light do not bend laterally. If they did so, you could see around a hill, and it would be impossible to run a straight line with a compass or transit. It is true that light, in passing through *media* of different densities, is refracted virtically in a slight degree; but the apparent position of an object in a lateral direction is subject to no change from this cause. If it were otherwise, you could not steer in a straight line to a light at all. So I conclude, from the fact the lookout on the Avon says he saw these two lights so far apart, as an excuse for not giving the alarm in time to avoid running into the Scott, shows that he either saw the light on the tug or else that he has fabricated an attempted excuse for his want of vigilance and intelligence. No prudent seaman, even if he saw what seemed to be two anchor lights 200 or 250 feet apart, would attempt to pass between them, on the supposition that they were on two different vessels; because the anchor light may be on the forward or after part of the vessel,—where, according to the judgment of those in charge of the vessel at anchor, it can be best seen, —and therefore a man in charge of an approaching vessel, when he sees an anchor light, and while the distance or the darkness prevents his seeing the exact situation of the hull, must take promptly the requisite steps to give the light so wide a berth as to pass clear of the vessel it is on. Not knowing which end of the vessel the light is displayed from, his only safety is in going far enough away to avoid a collision with even the largest and longest vessel; and the same may be said if two lights are seen within a possible vessel's length apart,—he must go so far away as to clear both, if he shall conclude they are on different vessels.

The proof also shows that it is quite common for vessels at anchor in Milwaukee bay to display two anchor lights, so that those in charge of vessels in motion in that locality, and acquainted with the usages in that regard, are bound to anticipate that a vessel at anchor may show two lights, even if such showing is contrary to law. But I do not think it can be deemed a violation of the rule to show two anchor lights, because it is possible a vessel lying at anchor may find it necessary to partly raise a sail so as to be ready to get under way in case of a change of wind, or the sudden rising of a storm, which would obscure one light, and make two lights absolutely necessary. It was not necessary on this occasion, it is true; but it is hardly possible that if a vessel situated in this manner should show two anchor lights, it could be brought as a charge against her in case of a collision.

I now come to consider briefly the proposition that the Scott should have shown a torch in time to have notified the Avon of her position; and that her failure to do so is such contributory negligence as excuses the Avon or mitigates the consequences of the collision. I have

only to say that I do not understand that it is necessary for a vessel at anchor to show a torch when it is clear that the approaching vessel, by a vigilant and proper lookout, could have seen her without a torch. Vessels at anchor in the night, with their own light properly set and burning, have a right to assume that an approaching vessel is obeying the law; that it has a proper lookout, and is taking the proper precautions to avoid a collision; and hence, when the watch on a vessel at anchor sees another vessel approaching at a distance of about three-quarters of a mile, and sees all her lights clearly and distinctly, he has the right to assume that the lookout on the approaching vessel sees his lights, and will in due time adopt the proper maneuver to pass clear of him. It is said, however, in behalf of the Avon, that the air was filled with smoke from the rolling-mills, so as to prevent the lookout on the Avon from seeing the barge's lights; but it hardly needs argument to demonstrate that, if a man standing on the deck of the barge could see all the lights of the Avon as she approached him, it was equally feasible for the lookout on the Avon to have seen the lights on the barge. If the rays of light from the green, red, and white lanterns of the Avon were clearly seen on the barge from the time she headed down the harbor, as is most abundantly proven, then there is absolutely no reason why a competent and vigilant lookout on the Avon should not have seen the barge's lights. That there was some smoke on the bay must from the proof be taken as an established fact, but it is evident that this smoke did not materially obscure the lights on the Avon nor the barge; for men on tugs out in the bay in the vicinity of the barge saw the Avon's lights and the city lights from the time she headed down the harbor, while the life-saving station men from the station at the end of the piers, and the men on the tug inside the piers, plainly saw the lights on the barge. Indeed, I can hardly conceive that smoke from these rolling-mills, after drifting a mile and a half over the water, could have retained enough of its soot and body to have obstructed the view of lights opposite the mouth of the harbor; but, if it ever did so, I feel sure from the proof that it did not do so on this occasion, because if there was not smoke enough to obscure the lights of the Avon and prevent them from being seen from the barge and the tugs in the vicinity of the barge, then there was none to prevent the lookout from seeing the lights of the barge from the forward end of the upper deck of the Avon. And if the watch upon the barge had no difficulty in seeing the Avon's lights, he had the right to assume that the lookout on the Avon could and did see his light, and that a torch was not called for.

My own conclusion from the testimony of the respondent is that the lookout and perhaps the captain of the Avon were most culpably negligent, and that the collision arose from this neglect. It must be borne in mind that the Avon had touched at Milwaukee, on her way to Chicago, to land all or a portion of her freight. Her men and officers had all been hard at work for many hours putting off this freight.

Their supper had been delayed until after they left the deck at Milwaukee, and winded the vessel for the purpose of running down the harbor. Supper was then ready, and the mates both went to supper by the captain's direction, although it was the mate's watch, and Joyce, who seems to have been employed on the Avon as a watchman, lookout, and deck hand, being paid extra at the rate of 30 cents an hour for the time he worked as deck hand, was placed on duty as lookout. Joyce had been at work as deck hand helping to unload, and had not had his supper, and just what he was doing during the time the steamer was running down between the piers does not clearly appear from the proof; but, as the mate says, about the time she passed the outer ends of the piers, he (the mate) directed him to take his place as lookout, and told him to keep a bright lookout, and placed an opera-glass on the top of the pilot-house, and called the lookout's attention to it. Shortly after he was thus placed, but how many minutes it is impossible to say from the proof, Joyce seems to have seen one or more of the barge's lights with his naked eyes. Instead of reporting these at once to the captain, he attempted to examine them through the glass, found the glasses were not clean, wiped them and then looked again, and saw two lights, which proved afterwards to be the lights on the Scott. He then reported them to the captain, who, instead of giving any orders to avoid a collision, directed the lookout to bring him the glass. It was handed to the captain, who attempted to use it, found it needed adjusting to his eyes, adjusted it, and then was in the act of looking for the lights, when the lookout, who had gone forward, called out that the barge was right under their bows, whereupon the captain ordered the wheel to starboard, but before any substantial change of course had been effected, he ordered the wheel hard to port, and before she had swung a point to starboard the Avon struck the barge.

The engineer and captain say the steamer was running under check, and not to exceed four miles an hour. If so, it would have taken about seven minutes to have run from the ends of the piers to the barge, as at four miles an hour it would take fifteen minutes to run a mile, and seven and a half minutes to run half a mile. There was certainly ample time for Joyce, the lookout, to have surveyed the entire bay, and taken in all the surroundings, long before the steamer had passed half the distance from the piers to the barge. What he was doing during this time he does not say; but I think I am justified in inferring that the mate having laid the field or opera-glass on the top of the pilot-house, Joyce left his post as lookout, made his way to the hurricane deck where he could reach the glass, and then went back to his place; but whether he went after the glass, after he had seen the barge's light by the naked eye, we do not know; but this does appear, that the mate, after he had directed Joyce to take his station as lookout, brought the glass from his room, put it on the top of the pilot-house, and called Joyce's attention to it. Joyce may have

at once left his station and gone for the glass, or may not have gone for it until after he saw the lights. In the mean time the steamer was running at the rate of four miles, and perhaps faster, towards the barge. Then, after Joyce had made out the lights, he wiped the glasses, and, we must presume, adjusted them to his eyes, and then reported the lights to the captain. The captain ordered the glass handed to himself, and, after taking time to adjust the glasses to his eyes, gave orders to starboard and then to port the wheel. Here was time enough lost, which, if properly employed, would have avoided a collision; for a steamer like the Avon, in a still night, would readily have swung clear of this vessel, by being properly maneuvered, in going from two to four hundred feet. If Joyce was fit for the duty of lookout, he ought to have been able to have seen the lights on the barge without the aid of a field or night glass. It may, I think, be safely assumed that any man who needs a night-glass to enable him to discover lights in time to avoid a collision is unfit for a lookout. His own natural vision should be sufficient to enable him to perform all the duties of a lookout. The night-glass is part of the outfit of the officer of the deck, and not of the lookout's. The men on the tugs, at the life-saving station, and on the deck of the barge, all saw the city lights, the lights in the bay, the Avon's lights, and the barge's lights without difficulty, and I can, therefore, see no reason why a glass should have been called into requisition to aid the lookout on the Avon. It seems to me to have been a fatal hindrance. While the lookout was getting it from the place where the mate had laid it, adjusting it to his eyes, wiping the glasses at each end, and while the captain was calling the lookout from his place to bring him the glass, the steamer was steadily and surely passing over the brief half-mile between the ends of the pier and the barge, and by the time the glass had told these men what their naked eyes, if vigilantly used, should have revealed to them, it was too late to avoid the collision.

It seems to me that Joyce, fatigued by his extra labors as deck hand in unloading freight, went sluggishly, and perhaps stupidly, to his duty as lookout; that he was not alert and watchful, as he should have been, but delayed and hesitated when he should promptly have given the alarm on the first discovery of the barge's lights; and the captain, for some inexplicable reason, instead of acting on the first information, and either stopping or backing, allowed his boat to keep on her course, while he deliberately attempted to scrutinize the lights reported to him, by the aid of the glass. If there was smoke enough to embarrass him, or render his vision uncertain, which it does not seem to have done for any one else in that locality at the same time, so much the more reason for increased caution on his part. I cannot, therefore, see that there was any fault on the part of the barge which contributed to this collision. If the night had been foggy, so as to make it doubtful to those on the barge whether the barge lights would be seen by those in charge of the Avon, it might have been their duty

to show a torch; but when there was no circumstance to justify the fear that their lights were not or could not be seen on the Avon, there was no occasion for such a precaution; and if, as already said, the lights of the Avon had been plainly and continuously in sight from the barge, then they could have had no reason to suspect that their lights would not be seen on the Avon. Seeing the Avon's lights, although she was coming directly towards the barge, and knowing that his own anchor light was properly placed and burning, the officer on watch upon the barge would naturally have supposed that the Avon would change her course in time to clear him; and at the time when it became evident that there was imminent danger of a collision, the officer of the watch on the barge caught a lighted lantern from the deck-house and waved it along the deck of the barge, to indicate danger. And comment is made by the respondent's counsel because he did not then show a torch; but it is apparent that the display of a torch at that time would have availed nothing, because the captain and lookout of the Avon at that time had become fully aware of their proximity to the barge, and knew then all that the torch could tell them, but too late to avoid the collision. The commissioner found that the fault for the collision was wholly with the Avon, and found the libelants entitled to recover the amount of the two policies paid, as charged in the libel, together with interest since such payment. The exceptions to his report are overruled, the report confirmed, and decree as recommended by the report.