## VAN ETTEN v. TOWN OF WESTPORT.

(District Court, D. Connecticut. March 21, 1894.)

No. 916.

MUNICIPAL CORPORATIONS—NEGLIGENCE—DRAWBRIDGES.

A steam barge approaching a drawbridge on a rising tide gave the customary signal when half to three-quarters of a mile away. Perceiving no movement to open the draw, she slowed down to about a mile an hour. Afterwards she kept stopping, backing, and going ahead, until, being from 75 to 150 feet from the draw, she sheered, became unmanageable, struck bottom on the flats, and sank. The draw tender was absent, but the first selectman and town agent heard the signals, and attempted to open the draw, but did not get it started open until after the barge sheered. *Held,* that the town, which maintained the bridge, was negligent, and therefore liable for the loss.

This was a libel by Ambrose Van Etten against the town of Westport to recover damages for the loss of a steam barge through the alleged negligence of the defendant in the opening of a drawbridge.

Carpenter & Mosher and Samuel Park, for libelant.

C. R. Ingersoll and Curtis Thompson, for defendant.

TOWNSEND, District Judge. This is a libel in personam for damages alleged to have resulted from the negligence of defendant in the operation of the draw in a bridge across the Westport river in said town. The facts in regard to the assumption of the maintenance and management of the bridge and draw by said town and its selectmen, and the questions of legal liability arising thereon, are the same as those already stated and considered in Greenwood v. Town of Westport, 60 Fed. 560. The course of Westport river is about south. It is crossed by a lower drawbridge and by the upper drawbridge, where the damage hereinafter considered was sustained. The draw of this upper drawbridge swings around in the arc of a circle, on a center pier, and has two openings, each 59 feet wide. The channel through the east opening is from 6 to 9 feet deep at high water, and is the only navigable one.

On the morning of December 12, 1891, the steam barge Col. W. C. Squires, 97 feet long, 17½ feet wide, and then drawing about 6 feet and 8 inches, loaded with coal consigned to Taylor's dock, some 250 feet above said drawbridge, with an experienced pilot (Allen) in charge, and having her master, Capt. Moys, who was a part owner, a licensed engineer, Ross Knapp, and a deck hand, Edward Staats, also on board, started on her course up said Westport river, and, after having passed through the lower drawbridge, proceeded towards the upper drawbridge, with the tide still rising, and ample water to pass through said draw to her destination. When she was between a half and three quarters of a mile below said bridge she commenced to give the customary signals, by whistle, to open the draw, and kept repeating them until she was close up to the drawbridge. She had a schooner in tow part of the way, and was then going at the rate of perhaps three miles an hour. When she got within half a mile of the draw, as the captain saw no movement

made to open the bridge, he slackened her speed down to a rate of about a mile an hour. Afterwards, the draw being still closed, she kept stopping, backing, and going ahead for some time, waiting for it to be opened. Finally, when within from 75 to 150 feet of the bridge, she commenced to sheer off across the flats towards the west end of the draw, and, after she had thus changed her course, the persons on the bridge began to open the draw. The Squires ran up close under the west side of the draw, struck bottom on the flats, and sank. An unsuccessful attempt was made to back her off, and another steam tug tried to haul her off, but it only succeeded in swinging her bow around for a few feet.

The draw tender was not at the bridge prior to the accident, but several citizens, including the first selectman and town agent, Wheeler, heard the signals, and went on to the bridge when the barge was from one-quarter to one-half of a mile away, and, after having waited a few minutes to let the people on the bridge get across, they commenced making efforts to open the draw. It was not until after the barge had sheered as aforesaid, and was 50 or 100 feet off, that they succeeded in getting the east end of the draw open some 4 to 12 feet, just before the Squires struck as aforesaid. At no time was the draw open a sufficient distance for the Squires to have passed through.

That the barge slowed down, backed, or stopped, is not admitted by the defendant's witnesses who were on the bridge; but, as they were not in a position to judge with any certainty, and as they admit that she might have done so without their knowledge, I have followed the usual rule in such cases, and adopted the statements of the captain, pilot, and engineer on this point. The Avon, 22 Fed. 905; The Alberta, 23 Fed. 810; The Columbia, 29 Fed. 718; The Hope, 4 Fed. 89; The Wiman, 20 Fed. 245; The Alexander Folsom, 3 C. C. A. 165, 52 Fed. 411; The Havana, 54 Fed. 413.

The theory of the defendant, as stated in its answer, was that the draw was open and the way clear for the barge to pass through. This theory was abandoned on the trial, and an amendment permitted, alleging, in substance, that the draw was being opened, and would have been open sufficiently for the barge to go through if she had kept on her course. The defense further proceeded upon the theory that there was no unreasonable delay; that the barge did not stop or back; and that the draw would have been open for the libelant to pass through if he had kept in the channel, but that "this barge was either deliberately, or so unskillfully, handled as to be driven aground." A further theory that the engine did not work properly was disproved by the testimony of defendant's witnesses, and was abandoned on the trial. No positive evidence was introduced to support the claim of negligent handling, except that of George W. Kirk, who testified that, standing in the middle of the bridge when the boat was 200 feet away, in the channel, and coming towards him, he saw the pilot turn the wheel to starboard, and saw the top of the rudder, and that it was "hard aport." This statement is not supported by the evidence of any of the other persons on the bridge, and Capt. Moys, by his testimony, and sketch of his boat and rudder, has

satisfied me that, with the boat loaded, and drawing 6 feet 8 inches of water, her rudder must have been entirely under water. Furthermore, the witness could not have seen the rudder from the center of the bridge, with the boat coming towards him in the channel. One other witness thinks if the boat had been handled right, she would have stayed in the channel, and gone through the bridge, but suggests no other reason for his belief. The rest of the witnesses agree that they do not know, and cannot explain, why the barge should have run up on the bank, instead of keeping in the channel.

The witnesses for libelant claim that from the time the barge slowed down at Wright's Island, nearly half a mile below the bridge, until she went aground, three-quarters of an hour elapsed; that during this time she was slowing, stopping, or backing, to try to keep afloat in the channel until the bridge should be open, and that, when they got up within 25 or 50 feet of the draw, having proceeded as slowly as possible, expecting every moment that the drawbridge would be opened, they found they were going to run into the draw, and so tried to back off, but that, either by reason of the wheel striking the mud and sucking bottom, or because of the fresh water running down and meeting the tide, or because they could not get stern steerage way after reversing the engine, the captain was unable to keep the barge in the channel, and she became unmanageable, and stuck on the mud, and her bow sheered off to the westward. According to the testimony of several of defendant's witnesses, the barge was from 140 to 190 feet from the bridge, and coming straight along slowly, without backing or stopping, and in that distance, as would appear from the testimony of defendant's witness McKenna, in about a minute, she sheered four points. The captain and pilot both testify that, if the wheel had been put hard to starboard, as testified, she could not possibly have made such a sheer, and give their reasons therefor. In the absence of expert testimony to the contrary, I think this evidence should have some weight upon the question of comparative probabilities. On the other hand, defendant strenuously claims that, if the barge sheered because the engine was reversed, she would have stopped, and not continued to run up to the bridge. It seems to me that this claim has considerable force upon the question of probabilities.

From the best consideration of all the evidence and the surrounding circumstances, I conclude that the total lack of proof to support the claim that the vessel was steered to port, or of any reason why it should have been so steered, makes it seem improbable that said claim is correct. The admitted facts that the barge, going slowly, had come almost up to the bridge, and that, as testified to by one of the defendant's witnesses, "they commenced to open the draw when she had changed her course, and was going across, towards the west end of the draw," and had got about a quarter of the way across the flats, coupled with the fact that when she ran aground her stem was close to the bridge, if it did not strike it, seem to show that either to steer to port or reverse the engine were the only things the libelant could have done. The draw was still closed. He could not tell, if he kept on, that it would be open

to pass through, as alleged in the amended answer. If it remained closed, he must run into it, and damage it and his barge. While it seems to me that the testimony of libelant's witnesses as to the cause of the disaster is true, yet I am of the opinion that, even if the libelant had steered to port, under these circumstances, it would not have constituted negligence on his part. See cases cited in Greenwood v. Town of Westport, supra. "If the situation was as defendants claim, the Thingvalla was not in fault for porting. * * *. Looking at the situation after the event, it may be apparent that such a change of course would have avoided the collision; but the Thingvalla's navigation must be judged by the knowledge she had, or ought to have had, at the time." Judge Lacombe, in The Thingvalla, 1 C. C. A. 87, 48 Fed. 764. Whether the delay in opening the bridge was unreasonable does not seem to be a mere question of time, but one of conditions. Under the conditions stated of tide, signals blown, and peril and damage caused by the delay, the absence of a bridge tender, the interval before commencing to attempt to open the draw, and the final failure to open it until such opening was manifestly too late to serve any useful purpose, the delay seems unreasonable and inexcusable. It is admitted that the town had ample notice when the barge was at least half a mile away, and that, through its first selectman and his volunteers, it had ample time to open the draw seasonably after they first came on to the bridge. Assuming the legal obligation of the town, it was its duty to have the bridge tender there, or, in his absence, it was the duty of the first selectman and town agent, who was there presumably representing the authority of the town, to see that the bridge was opened before the conditions already considered developed the disaster, and caused the damage on account of which these proceedings are brought. Furthermore, the captain testified that, if they had notified him of their inability to seasonably open the draw before he got close up to the bridge, he could have stopped and held the boat. No notice was given, but, on the contrary, the libelant had every reason to suppose, from the presence of the town agent and other persons on the bridge, and from their movements, that the draw would be open when he came up to it. I have not discussed the claim of libelant that the draw was never opened at all, because it is admitted that, if opened, it was closed immediately afterwards. I have not discussed the fact that, when the boat got close up to the bridge, the captain took the wheel, because it does not appear that this had anything to do with the disaster. The conclusions reached render it unnecessary to consider the question of compliance with the statutory requirements concerning licenses. The evidence clearly shows that the disaster could not have been caused by the violation of said statute. The Pennsylvania, 19 Wall. 125; The Bolivia, 1 C. C. A. 221, 49 Fed. 169. In view of the conclusions of law stated in the case of Greenwood v. Town of Westport, I am of the opinion that the defendant is liable. The libel may be amended in conformity with the facts herein found. Let a decree be entered for libelant, and let the usual reference be had to a commissioner to assess damages.