## THE OWEGO.

## THE CHICAGO.

## THE TOWNSEND DAVIS.

## THE W. I. BABCOCK.

## FOSBINDER v. THE OWEGO et al.

## UNION MARINE INS. CO. v. SAME.

### (District Court, N. D. New York. December 17, 1895.)

1. COLLISION—INEVITABLE ACCIDENT.
    A collision resulting from the sudden sheering of a vessel which is being towed in a river cannot be attributed to inevitable accident when it is apparent that there was nothing in the state of the elements which in any way contributed to produce it. Union S. S. Co. v. New York & V. S. S. Co., 24 How. 307, applied.

2. SAME—ABSENCE OF LOOKOUTS AND LIGHTS.
    Alleged absence of lights and lookouts need not be considered, where it is manifest that their presence could not in any way have operated to prevent the collision.

3. SAME—ERROR IN EXTREMIS.
    The sudden starting of the propeller of a steamer at the moment of an impending collision, with the purpose of checking a sheer which is carrying her upon the other vessel, is to be regarded as an error in extremis, and is not a ground for holding the steamer liable for damage caused by her propeller blades.

4. SAME—NAVIGATION IN CROWDED HARBORS.
    In the narrow waters of a harbor which is apt to be crowded with vessels, and where navigation is perplexed and complicated by wharves,

drawbridges, and craft of all description, moving and stationary, a steamer must proceed with the greatest care and foresight.

5. SAME—COLLISION IN NARROW RIVER—STEAMER PASSING TOW—SUCTION.

A large steamer was being towed stern foremost by two tugs down the river at Buffalo. Another steamer was lying at the Central dock, where the river is about 230 feet wide. Some 900 feet below the Central dock the river is spanned by a swinging bridge which leaves a space of only about 50 feet on either side of the central pier. When the tow had partially overlapped the stern of the steamer at the Central dock, the latter, which had previously swung her head out, started full speed ahead down the river, passing close to the tow, and, by the rapid revolution of her wheel as her stern came opposite the bow of the tow, caused the same to be drawn towards her by suction. This threw the stern of the tow in the opposite direction, and caused a sudden sheer, which she was unable, though assisted by the tugs, to control, and which resulted in a collision with a canal-boat lying on the other side of the river. *Held*, that the maneuver of the steamer in passing out ahead of the tow was unjustifiable, and she was solely in fault for the collision.

These were libels by Horace Fosbinder and the Union Marine Insurance Company against the steamer Owego, to recover damages resulting from a collision of the Owego with libelants' canal-boat. The steamer Chicago and the tugs Townsend Davis and W. I. Babcock were subsequently brought in by petition of the Owego.

Adolph Rebadow, for libelants.

George S. Potter, for the Owego.

George Clinton and Harvey D. Goulder, for the Davis and Babcock.

George B. Hibbard and Josiah Cook, for the Chicago.

COXE, District Judge. On the evening of October 2, 1893, the steamer Owego, partly loaded and headed up stream, was lying at the Erie Railway dock in Buffalo harbor. The steamer Chicago was at the same time, lying at the Central dock, headed down stream, her bow just reaching to the northerly side of Cincinnati street. The canal-boat W. A. Hedden was lying at the Kellogg Elevator loaded with grain. At about 9:15 the Owego, in charge of the tugs Babcock and Davis, proceeded, stern foremost, down the river, bound for Chicago. When the stern of the Owego reached a point about opposite amidships of the Chicago, the latter, having previously swung out so that the bluff of her starboard bow was 15 feet from the dock, started down stream bound also for Chicago. When the Owego had reached a point about opposite the Kellogg Elevator she took a sudden sheer to the port side of the river and collided with the Hedden causing the canal-boat to sink, totally destroying her cargo. The libel was originally filed against the Owego. On the petition of the Owego the tugs and the Chicago were made parties. The libelant, the Union Marine Insurance Company, having paid the full value of the cargo was subrogated to all the owners' rights and sues as for a total loss.

On the night in question there was no moon, the sky was overcast, but it was starlight and not dark. There was no wind or current to affect in any way the navigation of the river. The river at the point in question is about 230 feet in width and 17 feet deep. About 900 feet below the Central dock where the Chicago lay, 180

feet below the elevator dock where the canal-boat lay and 2,600 feet below the Erie dock where the Owego lay, is the Michigan street bridge. This is a swing bridge with a central pier and a clear space about 50 feet wide on the starboard side and a somewhat wider space on the port side. The port side is usually taken by large steamers when going down the river. The Owego is a large steamer, 353 feet over all and 41 feet beam. Her wheel is 12½ feet in diameter with a pitch of 25 feet. Her draught on the evening in question was 8 feet, 3 inches forward and 14 feet, 10 inches aft. The Chicago is 265 feet on the keel, about 280 feet over all and 36⁸/₁₀ feet beam. Her wheel is 11½ feet in diameter with a pitch of 15½ feet. Her draught was 9 feet forward and 13¼ feet aft. The Babcock is 73 feet long and 17 feet beam. The Davis is 80 feet long and 19 feet beam. The draught of the tugs is about 10 feet. The canal-boat was 98 feet long and 17½ feet beam. The Babcock, which was the forward tug, had two lines extending from the Owego's port and starboard quarters to her towing post. The space between the two boats was about 20 feet in the clear. The Davis, whose duty it was to act as a rudder for the Owego and hold her back in case of danger, was attached to the Owego by a line extending from her forward towing post to a chain bridle attached to the Owego's bow. The speed of the tugs and the Owego down the river was from 1½ to 2 miles an hour. The Owego's rudder was held amidships, her engines at a standstill. Her master was on the bridge, the first mate was on the forward deck and the second mate was aft. All her officers were at their posts. The moment the sheer began it was noticed by those in charge of the steamer and the tugs. The Davis immediately reversed and backed with all her power. The Owego ported her wheel and started ahead, the Babcock also ported and endeavored to pull the Owego's stern into the middle of the stream. The tendency of all these maneuvers was, of course, to lessen the force of the Owego's sheer. Nothing more could have been done to prevent it.

It is manifest that this was not an inevitable accident. Union S. S. Co. v. New York & V. S. S. Co., 24 How. 307, 313. It is conceded upon all sides that there was nothing in the elements which in any way contributed to produce it. The fault must, therefore, be attributed to the bad seamanship of the vessels or one of them. It is also conceded that the direct cause of the accident was the sudden sheer of the Owego. When, therefore, it is ascertained who caused this sheer the true culprit will stand revealed. The only accusation against the canal-boat is that she did not display a light. There were lights at the elevator and electric lights on the docks and at the bridge so that surrounding objects could be seen at a considerable distance. There is proof that there was a globe lantern forward on the canal-boat and also a light in her cabin; but whether there was or not it is obvious that the failure to display a light upon the canal-boat did not produce the sheer of the Owego. The canal-boat might have been ablaze from stem to stern with electric lights and still the Owego would have sheered.

The only faults attributed to the Owego are, first, that she had no lookout, and, second, that the violent working of her wheel at the

time of the collision added to the damage, the blades of the wheel tearing out the bottom of the canal-boat. The absence of a lookout, like the absence of the light, in no way contributed to produce the sheer. It is unnecessary to determine whether a lookout was or was not proper in such circumstances, because the accident would have happened precisely as it did although a score of lookouts had been present. The moment the sheer occurred it was instantly perceived by those in charge of the Babcock and the Owego. What took place thereafter was with full knowledge of all the facts bearing upon the situation. No additional fact could have been imparted by a lookout. How a lookout could have prevented the sheer or caused the Owego's wheel to cease revolving at the moment of contact with the canal-boat, it is not easy to perceive. All that a lookout could see was seen; all that a lookout could do was done at the instant. It was a crisis in which no help could be found either in lights or lookouts.

As to the second accusation two answers are manifest. The rapid working of the Owego's wheel ahead tended to reduce the force of the sheer and it is altogether probable that the blow would have been more serious had not this effort been made to stop her sidewise drift. But, however this may be, the rule is well settled that in such a situation of imminent peril, which was in no way caused by the Owego, her master is not responsible for mistakes in judgment. She was in extremis at the time and her master took measures which, in the hurry of the moment, he thought were best calculated to avert danger. It follows that no fault can be attributed either to the Owego or the canal-boat which, by any possibility contributed to produce the accident.

Regarding the two tugs no negligence has been pointed out which at all accounts for the sheer. It is admitted that they were properly attached to the Owego; that it was proper to tow her down the river stern foremost. Indeed, this was a necessity for she was too long a boat to be turned around, except at a point below the drawbridge. The tugs and tow were in the middle of the river where they should be and were proceeding at a proper rate of speed. It is suggested that the tugs should have had a lookout, but the masters of both tugs were shown to be in the pilot house raised above the deck and in a position where they could see the surrounding objects more readily than a lookout, and, as before stated, the presence of a lookout could not have prevented the sheer. Negligence cannot, therefore, be predicated of his absence.

It is also suggested that after passing the Chicago the leading tug turned the stern of the Owego too suddenly to the port side of the river when the tug was straightening up for the port draw. The weight of testimony is decidedly against this theory, the testimony being that the turn was gradual and hardly perceptible, but even if it were made as suggested it would not account for the sidewise sheer. In short, there is nothing in the navigation of the tugs and tow or in the position of the canal-boat which, upon any tangible theory, can account for the sheer of the Owego. The record will be examined in vain for any fault on the part of the

canal-boat, the Owego, or the tugs which contributed, even remotely, to produce the accident. The Owego and the tugs had proceeded from the Erie dock down the river in the usual manner and at the usual speed and it is well-nigh certain that, but for the peculiar action of the Chicago, they would have passed through the draw and to the lake without accident. The tugs and tow being rightfully in the river and proceeding with care and prudence in the usual way were not required to take any unusual precautions against the Chicago; they were not called upon to anticipate that she would crowd herself into the narrow channel at the very moment when the Owego was passing her. The Mascot, 13 C. C. A. 334, 66 Fed. 74; The Majestic, 1 C. C. A. 78, 48 Fed. 730.

Thus far, then, the following propositions have been established: First. The accident was not inevitable. Second. It was not the fault of the canal-boat. Third. It was not the fault of the tugs. Fourth. It was not the fault of the Owego. By this process of exclusion it might seem to follow, as a necessary conclusion, that it was the fault of the Chicago. It was the result of bad seamanship somewhere. So much is certain. Five boats were engaged in the transaction. Four of them must be held blameless. Is there not a presumption that the fifth was at fault? Possibly so, but certainly an inadequate presumption to inculpate the Chicago unless aided by proof of some substantive fault sufficient to cause the accident. The burden is upon those who accuse the Chicago to prove negligence on her part. When, however, an act has been established which might have caused the accident, the court in deciding whether it did do so or not may take into consideration the fact that no other act of carelessness has been shown. In other words, when the court is seeking the reason for a given result testimony tending to establish a cause, which might be rejected as insufficient and speculative in some circumstances, may become all sufficient when the most careful scrutiny fails to discover any other cause. Should the court reach the conclusion that the conduct of the Chicago offers a sufficient explanation of the collision it will be the duty of the court so to say, even though unable to point out with exact precision the manner in which the suction produced by the Chicago operated upon the Owego. It is enough if the evidence establishes: First. That there is such a force as "suction," that it is likely to follow from certain causes and is fully recognized as one of the dangers of navigation. Second. That the Chicago produced sufficient suction to cause the Owego to sheer. The Buffalo river at the point in question is a narrow waterway. When the size of the boats is considered it is an exceedingly narrow waterway. Only about 900 feet below the Chicago was a drawbridge with draws so narrow that the Owego, if she went through precisely in the middle, would have less than five feet clear space on either side. Add to this the fact that there is a decided curve in the river at the point in question and the further fact that it was night, and nothing more is needed to prove that to tow an immense steamer stern foremost from the Erie dock through one of the draws was an exploit requiring good judgment, prudence and

nautical skill of a high order. It was a difficult task at best and no one was justified in heedlessly and unnecessarily adding to its dangers.

What is the law applicable to this situation? The Revised Statutes of New York provide that:

"Whenever any steam-boat shall be going in the same direction with another steam-boat ahead of it, it shall not be lawful to navigate the first mentioned boat so as to approach or pass the other boat so being ahead within the distance of twenty yards; and it shall not be lawful so to navigate the steam-boat so being ahead, as unnecessarily to bring it within twenty yards of the steam-boat following it." Rev. St. N. Y. (8th Ed.) p. 2246, § 7.

In a note following rule 8 for the government of pilots, approved October 8, 1891, and rule 6, approved February 14, 1895, it is provided that:

"The foregoing rules are to be complied with in all cases except when steamers are navigating in a crowded channel, or in the vicinity of wharves; under such circumstances steamers must be run and managed with great caution," etc.

Rule 25 of the act of February 8, 1895, provides that:

"In all channels less than 500 feet in width no steam vessel shall pass another going in the same direction," etc. 28 Stat. 645, 649.

The latter act is, of course, inapplicable to an event occurring in 1893.

Assuming that a vessel in the situation of the Owego can be considered the "steamboat ahead" it would seem that at the present time the action of the Chicago is condemned by both state and federal statutes. The federal law forbids passing at all in a channel 230 feet wide and the state law forbids passing within 60 feet. But these rules are mentioned not so much to prove their applicability to the present case as to show the care taken by the lawmakers to safeguard navigation by preventing the crowding of vessels in narrow waterways. In The Saratoga's Case, 1 Fed. 730, the court held the steamer liable for attempting to pass a tow in circumscribed water when, had she waited a few moments, she could have passed in safety, the court observing:

"It was her duty to wait till they reached a point in the river where they could have safely passed."

To the same effect is The Boston, Olc. 407, Fed. Cas. No. 1,672. After holding that the boat first under way should not be interfered with and that the second boat should use the utmost prudence and precaution the court says (page 413):

"The attempt, then, to take the lead, was manifestly hazardous; and as it was made deliberately by the Boston, and not two minutes could have been lost to her had she waited till all danger was passed, she is justly responsible for the damages occasioned by her precipitancy and want of circumspection."

It is the duty of a vessel when navigating a crowded harbor to proceed with the utmost caution. "Ordinary care, under such circumstances, will not excuse a steamer for a wrong done." Culbertson v. Shaw, 18 How. 584; The Alleghany, 9 Wall. 522.

The rule deducible from these authorities, and other which might

be cited, is that in the narrow waters of a harbor which is apt to be crowded with vessels and where navigation is perplexed and complicated by wharves, drawbridges and craft of all descriptions moving and stationary, a steamer must proceed with the greatest care and foresight. How did the Chicago proceed? Her bows had been sprung from the dock about 15 feet and when the Babcock and Owego were just abreast of her, the stern of the latter having lapped the Chicago about 100 feet, the master of the Chicago signaled the engineer to go ahead strong and the vessel ran several hundred feet, her propeller revolving as rapidly as possible and making considerable commotion in the water. She did not keep close to the wharf, but headed at first for the port, or westerly, draw of the Michigan street bridge, and at the time of the sheer was certainly within 50 feet of the center of the river. When the bow of the Owego came about abreast with the stern of the Chicago the sheer commenced, the bow of the Owego swinging towards the Chicago's stern until the two vessels actually came together. The Owego's stern swung towards the canal-boat and continued to do so until it struck her as described. The Chicago proceeded on her way, but in going through the easterly draw she first bumped against the fenders around the central pier and then against the Nyack, which was moored just below the bridge at the easterly dock. The inference from the testimony is very plain that the master of the Chicago was for some reason in great haste to leave the dock and reach the lake in advance of the Owego. He says, "I was ahead and thought I would stay there. * * * I omitted no order which would have the effect of keeping me ahead." The suction produced by the natural displacement of a moving vessel was, in this instance, greatly increased by the rapidly revolving wheel of the Chicago. As the wheel was making as many revolutions as possible, while the Chicago, was proceeding a distance of 400 or 500 feet, it follows that the suction caused by the wheel must have been powerful. The Chicago attained a speed of about three miles an hour; it is probable, therefore, that the suction caused directly by the wheel decreased in proportion as the suction caused by the progress through the water increased. Whichever predominated at the time of the sheer there can be no doubt that suction was present and that the Chicago caused it.

The learned counsel for the Chicago argues with great force and ability that the Chicago could not have caused the sheer for the reason, inter alia, that she was in every way smaller than the Owego and her displacement was consequently much less. For these reasons it is urged that, if there were suction at all, its tendency would be to draw the smaller to the larger vessel and not vice versa. This would probably be true if they were passing in the ordinary way, but it must be remembered that it was the Owego's bow that sheered and that this was opposed to the Chicago's stern. The draught of the Chicago's stern was $13\frac{1}{2}$ feet, the draught of the Owego's bow was 8 feet, 3 inches, or 5 feet, 3 inches less than the Chicago. At the point where the suction must have operated the Chicago was, then, the more difficult of the two to move from her course. The Owego's bow, being pointed, would produce little

suction when compared with the relatively round stern of the Chicago supplemented by the volume of water thrown back from her propeller blades. That the bow of a vessel drawing $6^{1}/_{2}$ feet less than her stern should, in a narrow channel, be deflected towards the stern of a vessel making the commotion that was made by the Chicago is not at all surprising. The effect of suction has recently been considered in the cases of The Alexander Folsom, 3 C. C. A. 165, 52 Fed. 403, and The City of Cleveland, 56 Fed. 729. In the latter case the court makes an observation on the subject which is applicable to the facts of the case in hand. The court says that:

"The suction of two vessels passing each other is not very powerful. It is too short to have any particular effect upon the action of the two vessels, unless one is much larger than the other; whereas, if they are going in the same direction, and passing near each other it has a very powerful effect to deflect the weaker vessel from her course."

Although the Owego is much larger than the Chicago it is thought that her bow was "weaker" than the Chicago's stern in offering resistance to the force of suction. The Chicago knew that the Owego, an immense propeller, larger than many ocean steamers, with two tugs, the procession being 550 feet in length, was coming down the middle of the river. She knew, or ought to have known, that they were destined for the port draw at Michigan street. She knew that the bridge made the river at that point almost a cul-de-sac and that any collision with the piling in going through the draws was likely to create confusion especially if two vessels were attempting to make the draws at the same time. What excuse has the Chicago offered for thrusting herself into this dangerous channel at the very time when an immense vessel comparatively helpless was passing? The Owego was in motion, she could not stop, she had the right of way. Had the Chicago waited two minutes the Owego would have passed by, in four minutes more she would have cleared the draw. Prudence would seem to suggest, where absolute safety can be secured by so trifling an inconvenience as a delay of two minutes, that it is negligence to incur unnecessary risk. But, assuming that the Chicago was not required to wait, surely it was her duty to proceed with extraordinary caution. She should not have gone ahead "wide open" for several hundred feet; she should not have gone so far to port and she should not have attempted to pass, or even to keep up with, the Owego. The sheer followed almost immediately after the Chicago's appearance upon the scene. The rapid working of her wheel in such close proximity to the Owego's bow was sufficient to produce the sheer, and, as no other cause can be discovered, the court is constrained to hold the Chicago liable. Either this must be done or the court must say that the accident was the result of an inscrutable fault. There is no alternative. The court has been unable to find any precedent for the latter conclusion where the testimony and the presumption drawn therefrom all point in one direction as unerringly as in the case at bar.

It follows that the libelants are entitled to a decree against the Chicago with costs and a reference to compute the amount due. As against the Owego, the Babcock and the Davis the libels are dismissed without costs.