## THE FAYETTE BROWN.

### (District Court, N. D. Ohio, E. D. March 27, 1912.)

### No. 2,043.

COLLISION (§ 98*)—STEAM VESSELS MEETING—VIOLATION OF RULES.

    A steamer, which passed down through the American Soo locks at night and proceeded on her way at full speed and without giving any signals to other vessels in the river, as required by rule 24 of the Rules for the Great Lakes (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 649 [U. S. Comp. St. 1901, p. 2891]), *held* solely in fault for a collision with a barge passing up in tow on her proper course, and a second collision with another barge resulting from the first.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 208–210; Dec. Dig. § 98.*

    Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit for collision by the Saginaw Bay Transportation Company, as owner of the barge Bottsford, against the steamer Fayette Brown and Pittsburgh Steamship Company, brought in by the claimant of the Brown. Decree against the Brown.

George B. Marty, for Saginaw Bay Transportation Co.

Goulder, Day, White, Garry & Duncan (O. D. Duncan, of counsel), for Northwestern Tr. Co.

Hoyt, Dustin, Kelley, McKeehan & Andrews (George W. Cottrell, of counsel), for Pittsburg Steamship Co.

DAY, District Judge. This action arose out of a collision between the steamer Fayette Brown and the barge Bottsford about 10 o'clock on October 29, 1906, a short distance below the locks of the Soo. Both vessels were down bound; the Bottsford laden with lumber, and the Brown with ore. The Bottsford and her towing steamer, the Leuty, also owned by the libelant, locked through ahead of the Brown, and on coming out of the lock the Leuty took the Bottsford alongside on her starboard side and endeavored to dock at the coal dock known as Kemp's Dock on the American side of the river. The Brown passed down through the lock a little later, and in proceeding down the river collided with the Bottsford, as the Bottsford and the Leuty were trying to reach Kemp's Dock. In the original action the libelant proceeded against the Brown alone. Later the owner of the Brown brought in the

Pittsburg Steamship Company, owner of the barge Nasmyth and the steamer Houghton, to answer to the libelant's claim, on the ground that the fault of the Houghton and Nasmyth had caused the Brown to collide with the Nasmyth and throw the Brown in collision with the Bottsford. A number of boats were in the immediate vicinity at the time of these disasters.

It appears from the record that the steamer Fayette Brown locked through the American Soo with the steamer Wawatam. The Wawatam proceeded out of the lock and then stopped to take on supplies. The Brown passed her on the Wawatam's starboard side, and the Houghton, with the Nasmyth in tow, was somewhat below and bound up for the locks, and below the Houghton was the Leuty, with the Bottsford lashed to her starboard side, attempting to make a landing at Kemp's Dock, having come down from the American Soo. The boats being located in this manner, there were two collisions, one between the Nasmyth and the Brown, and the second between the Bottsford and the Brown, and, as I have indicated, both the Brown and the Bottsford claim damages; the Bottsford having first filed a libel against the Brown, and the Brown filing a petition under the fifty-ninth admiralty rule (29 Sup. Ct. xlvi), bringing in the Pittsburg Steamship Company owner of the Houghton and Nasmyth. It appears from the record that the Leuty is a wooden steamer of 178 feet length and 33 feet beam, the Bottsford is 164 feet long and 32 feet beam, the Brown 320 feet long and 42 feet beam, and the Nasmyth is 365 feet long. The steamer Houghton is over 400 feet long.

It appears, from a fair consideration of the testimony, that after the Bottsford and Leuty were lashed together they slowly proceeded down the river, seeing the Houghton and Nasmyth coming up on the range known as the Bayfield Rock Range, the ordinary range used by steamers using the St. Mary's river entering the locks. The Leuty and Bottsford passed 75 feet or 100 closer to the shore than the Nasmyth, and about this time the Leuty and the Bottsford started to turn into the dock. They were about abreast of Kemp's Dock. The captain of the Leuty was on the pilot house in charge of the vessel; that while heading toward the dock going up the stream, and at perhaps 400 or 500 feet from the dock, the Brown struck the Bottsford. There is some dispute as to whether or not the Leuty and Bottsford were moving forward at the time of this collision; but I do not consider this of much importance, in view of the other facts in the case, because from the entire record it is quite apparent to me that, if the Brown had not collided with the Nasmyth, there would have been no collision with the Bottsford. The Brown came down the river at full speed, not having blown any signals, and when about a quarter of a mile away the Leuty blew her two-blast signal, indicating that the Leuty was going to port.

Now rule 24 of the Rules Governing Navigation on the Great Lakes provides:

"That in all narrow channels where there is a current, that is the river St. Mary, St. Clair, Detroit, Niagara, and St. Lawrence, when two steamers are meeting, the descending steamer shall have the right of way, and shall,

before the vessels shall have arrived within a distance of one-half mile of each other, give the signal necessary to indicate which side she elects to take."

So, under this rule the Brown had the right of way, and also had the duty imposed upon her of giving a signal within half a mile of the other vessel. This was admittedly not done. On the other hand, it is claimed that the Leuty blew a two-blast signal, which was not answered. And it is claimed by the Brown that the Leuty was at fault, because she did not blow an alarm whistle or signal. I do not think this was necessary. There seemed to have been no misunderstanding between the Brown and Leuty as to the navigation of the respective vessels. The Leuty supposed the Brown would pass under her stern, and the Brown expected to pass in this manner.

The application of rule 27 is urged by counsel for libelant. This rule provides as follows:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary, in order to avoid immediate danger."

I have given considerable consideration to the testimony of the officers of the various boats as to what was done on their own vessels. This testimony is entitled to great weight. The Alexander Folson, 52 Fed. 403, 3 C. C. A. 165; The Captain Sam (D. C.) 115 Fed. 1000.

As to how the Brown was navigated in coming down the river, I will take the captain's own testimony. He testified that he saw the Bottsford and the Leuty and observed their maneuvers, and that he saw the Nasmyth, and that she was in tow of the Houghton; that he opened his engine wide open ahead and headed down the river; that when he got close to the Nasmyth he observed she was drifting down upon him, and he also discovered that the Bottsford was drifting into his course; that he hailed the Nasmyth to hold up and the Bottsford to go ahead, and whistled when he got within a short distance of the Nasmyth. He did not check during this time until he was very close to the Nasmyth, when he collided with the Nasmyth, and this collision caused the Brown to sheer in such a manner that the collision with the Bottsford occurred. His wheelsman testified in open court that he called the captain's attention to the danger and the Nasmyth when the Brown had gotten down to within 200 feet of the Nasmyth.

Now, the Brown came down this river giving no signals and going at full speed. The captain of the vessel observed what they were doing. He did not answer the Leuty's two-blast signal. He evidently expected that certain things would happen. These things did not happen, and the injuries occurred.

It is apparent from reading the record that this Brown was navigated with great recklessness. This would make applicable the rule laid down in the case of The New York, 147 U. S. 84, 85, 13 Sup. Ct. 211, 216 (37 L. Ed. 84), where the court says:

"In view of the recklessness with which the steamer was navigated that evening, it is no more than just that the evidence of contributory negligence

on the part of the sailing vessel should be clear and convincing. Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel."

Now, the Brown being in fault, what was the conduct of the Houghton and the barge Nasmyth? In so far as the Houghton is concerned, I think it is shown by the record that, when the Nasmyth was abreast of the power house, the Houghton dropped the tow line, and the tug General had made fast to the barge Nasmyth and taken charge of her. The Houghton had then proceeded up the river and was in the lock at the time of the collision. So no fault can attach to the Houghton.

Now, what was the Nasmyth doing at the time of this collision? It appears that there was a wind blowing toward the American shore; that it was a bright moonlight night; that the Nasmyth was light, and projecting far out of the water; that she was proceeding, lashed to the tug General, heading on the extreme outer end of the north pier of the Poe Lock, and her course was to the starboard of the Bayfield Range line; that, at the time of the collision between the Brown and the Nasmyth, the Nasmyth was north of the Bayfield Range; that at all events the Nasmyth was observed by the wheelsman of the Brown some 200 feet before the vessels met. The wheelsman testified that he called the captain's attention to the fact that the Nasmyth was drifting. It is also testified to by two other witnesses, who were coal heavers, on the shore, that the Nasmyth was drifting toward the American shore. These witnesses, however, were abreast of the boat, and would have some difficulty in judging of the fact to which they testified. On the other hand, those on board of the Nasmyth and the Wawatam testified that the Nasmyth was not drifting. In any event, the Nasmyth was proceeding on a proper course, and there was plenty of navigable water to permit of the safe navigation of the Brown, had the Brown been properly navigated. Even though the Nasmyth were drifting, she was taking a course which was customary, and which permitted of ample space in which the Brown might pass. Mitchell Transp. Co. v. Green, 120 Fed. 49, 56 C. C. A. 455.

The Brown claims that the Nasmyth had not a proper lookout, and did not give proper signals. The testimony shows that the Nasmyth was in tow of a tug, and that in any event the proximate cause of the collision was the reckless navigation of the Brown. As I have indicated, I could see no fault in the manner in which the Leuty and Bottsford were navigated, and it is plain that the responsibility for these disasters must rest upon the Brown, and that the two collisions were approximately caused by the fault of the Brown. This is plain, when we stop to consider that the Brown left the lock, passed the Wawatam, then headed down the river at full speed ahead, without giving any signals until the Brown was almost immediately upon the Nasmyth. The captain evidently assumed too many things and paid too little attention to careful navigation in this crowded river. Proceeding down the river with an

utter disregard of signals and at full speed, the captain of the Brown admits that the proper way was to move slowly, and the Brown's fault is clear.

The burden rests upon the cross-petitioner to prove contributory fault on the part of the Nasmyth and the Houghton, and having failed so to do, and the Brown being at fault in reference to the collision with the Bottsford and the Leuty, the Brown must bear the responsibility of these two collisions.